UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL CASE NO.** |
| | : | |
| v. | : | **VIOLATIONS: 18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| **ANTOINE P. HUDSON, ALSO KNOWN AS** | : | |
| **ANTIONE P. HUDSON** | : | |
| | : | |
| Defendant. | : | |

## INFORMATION

The United States Attorney informs the Court that:

### COUNT ONE:
### CONSPIRACY TO ENGAGE IN INTERSTATE TRANSPORTATION OF STOLEN PROPERTY AND TRAFFIC IN MOTOR VEHICLE COMPONENTS
### (18 U.S.C. § 371)

### INTRODUCTION

At all times relevant to this count:

1. Defendant ANTOINE P. HUDSON, also known as ANTIONE P. HUDSON, lived in Washington, D.C. and Upper Marlboro, Maryland.

2. J.W. was a friend of defendant HUDSON since high-school.

3. R.L. was a friend of J.W. and lived in Washington, D.C.

### THE CONSPIRACY

4. From in or about June, 2003, and continuing through in or about May, 2004, in the District of Columbia and elsewhere, defendant HUDSON did willfully and knowingly combine, conspire, agree, and confederate with others known and unknown to commit offenses against the United States, that is:

A. transporting, transmitting, and transferring in interstate commerce stolen goods, in

    violation of 18 U.S.C. § 2314; and

 B. trafficking in motor vehicles and their components with falsified, altered, or removed identification numbers, in violation of 18 U.S.C. § 2321.

## THE GOAL OF THE CONSPIRACY

 5. The goal of the conspiracy was for defendant HUDSON, J.W., and others known and unknown, to enrich themselves by selling stolen luxury vehicles and enjoying said profits for their personal use.

## MANNER AND MEANS OF THE CONSPIRACY

 6. In order to achieve the goal of the conspiracy, defendant HUDSON and J.W., along with others known and unknown, used the following manner and means, among others:

 7. The essence of the scheme involved the following: (a) J.W. would identify an individual interested in buying a stolen luxury vehicle and, thereafter, serve as the buyer's sole contact for purposes of conducting the sale and delivering the stolen luxury vehicle to the buyer; (b) defendant HUDSON would identify stolen luxury cars for sale and, after receiving payment from J.W., provide J.W. with the stolen luxury car being purchased by the interested buyer.

 8. It was further a part of the conspiracy that defendant HUDSON would inform J.W. of the availability of stolen luxury vehicles whose vehicle identification number ("VIN") had been respectively altered to prevent detection of the vehicles' legitimate owner.

 9. It was further a part of the conspiracy that J.W. would inform the buyer of the available stolen luxury vehicles, accept a deposit from the buyer and deliver the deposit to defendant HUDSON for purposes of securing the purchase of a stolen luxury vehicle then available for sale.

 10. It was further a part of the conspiracy that J.W. would receive the buyer's final

payment, deliver the stolen luxury vehicle to the buyer, and, thereafter, provide defendant HUDSON with the buyer's final payment for the stolen luxury vehicle.

## OVERT ACTS

11.     Within the District of Columbia and elsewhere, in furtherance of the above described conspiracy and in order to carry out the objects thereof, defendant HUDSON, J.W., and others known and unknown, committed the following overt acts, among others:

(1)     On or about July 15, 2003, J.W. offered to facilitate the sale of a stolen luxury vehicle from defendant HUDSON to R.L.

(2)     On or about August 6, 2003, in the District of Columbia, defendant HUDSON met with J.W. to discuss R.L.'s interest in purchasing a stolen luxury vehicle from defendant HUDSON.

(3)     On or about April 19, 2004, J.W. gave HUDSON $10,000 as a down payment on a stolen Mercedes for R.L.

(4)     On or about April 26, 2004, J.W. obtained possession of a stolen Mercedes CLK500 ("CLK500") from defendant HUDSON in Upper Marlboro, Maryland.

(5)     On or about April 26, 2004, in the District of Columbia, J.W. drove the CLK500 to R.L.'s residence.

(6)     On or about April 26, 2004, R.L. test-drove the CLK500 with J.W.

(7)     On or about April 26, 2004, J.W. instructed R.L. to make the final payment on the CLK500 on the following day.

(8)     On or about April 27, 2004, in the District of Columbia, J.W. parked the CLK500 in front of R.L.'s residence.

(9)     On or about April 27, 2004, J.W. received $20,000 from R.L.

(10)  On or about April 27, 2004, J.W. gave R.L. the key to the CLK500.

(11)  On or about April 27, 2004, J.W. gave defendant HUDSON approximately $20,000.

**(Conspiracy, in violation of Title 18, United States Code, Section 371)**

**COUNT TWO:**
**CONSPIRACY TO MAKE FALSE STATEMENTS TO FINANCIAL INSTITUTIONS**
**(18 U.S.C. § 371)**

**INTRODUCTION**

At all times relevant to this count:

<u>The Defendants and Coconspirators</u>

1. Defendant ANTOINE P. HUDSON, also known as ANTIONE P. HUDSON, owned a business named A-NU Properties ("A-NU") based in Washington, D.C. Defendant HUDSON held A-NU out to be a property management company.

2. V.H. was a coconspirator who is not charged in this Information. V.H. was a friend of defendant HUDSON and was a loan officer in a mortgage company named First Mortgage.

3. J.D. was a coconspirator who is not charged in this Information. J.D. was a friend of defendant HUDSON and helped conduct the business of A-NU.

4. Fremont Savings and Loan ("Fremont") was a financial institution with deposits insured by the FDIC.

<u>Securing Financing for a Home Refinance</u>

5. Mortgage lenders required an individual who applied for a residential mortgage loan to undergo a credit analysis to determine the borrower's ability and willingness to repay the mortgage loan. Mortgage lenders required:

   a.  that the borrower submit a Uniform Residential Loan Application along with

documents proving the borrower's employment, assets, and source of his/her down payment and closing costs;

      b.    that the borrower document that he/she has sufficient monthly income to meet the periodic payments required by the mortgage loan and his/her other living expenses;

      c.    that the borrower have a history of good credit, that is, a record of borrowing money and repaying debt; and

      d.    that the borrower certify that he or she intends to reside in the property as his/her primary residence.

6.    The borrower was required to certify to mortgage lenders that the application, documentation, and other information submitted in support of the borrower's mortgage loan application was true and correct.

7.    Mortgage lenders relied on the accuracy and truthfulness of the information in the application and the supporting certifications and other documents submitted to it by the borrower in determining whether to make a mortgage loan.

8.    Mortgage lenders often times relied on mortgage loan officers to communicate with the borrower and complete the loan application on behalf of the borrower. In addition, mortgage loan officers usually collected information from a borrower about a borrower's employment, assets, liabilities, and credit history. The mortgage loan officers also obtained supporting documentation to complete the loan application, which the mortgage loan officers submitted to mortgage lenders.

## THE CONSPIRACY

10. From in or about May 2004 and continuing thereafter through in or about June 2005, within the District of Columbia and elsewhere, defendant HUDSON, V.H., and others known and unknown willfully and knowingly did conspire, confederate, combine, and agree with to commit offenses against the United States, that is, making false statements to financial institutions whose deposits were insured by the FDIC for the purpose of influencing the financial institutions to approve mortgage loans, in violation of 18 U.S.C. §§ 1014 and 2.

## GOAL OF THE CONSPIRACY

11. It was a goal of the conspiracy that defendant HUDSON, V.H., and other coconspirators would enrich themselves by obtaining mortgage loans by fraud.

## MANNER AND MEANS OF THE CONSPIRACY

12. It was part of the conspiracy that defendant HUDSON identified a financially distressed homeowner whose property had a true market value which far exceeded the amount of any pending mortgage lien.

13. It was further part of the conspiracy that defendant HUDSON arranged for himself or an acquaintance to buy the property from the homeowner without disclosing the sales price for each transaction.

14. It was further part of the conspiracy that defendant HUDSON and others known and unknown expressly and/or impliedly promised to each homeowner in a false and fraudulent manner that A-NU would: (a) use the proceeds of any property transaction to extinguish the homeowner's debts; and (b) allow the homeowner to repurchase the property within a year of any transaction, when in truth, and in fact, defendant HUDSON: (a) intended to divert a substantial portion of the mortgage

loan proceeds for his own personal gain and profit; and (b) fully knew that the distressed homeowner was unaware of the properties' true market value and would be unable to repurchase the property.

15.   It was further part of the conspiracy that defendant Hudson caused the buyer to receive a mortgage loan far in excess of the distressed homeowners actual financial needs.

16.   It was further part of the conspiracy that defendant HUDSON relied on V.H. and others known and unknown to create false mortgage loan applications and other material documents to establish the buyer's creditworthiness for the maximum mortgage loan commensurate with the properties' true market value.

17.   It was further part of the conspiracy that defendant HUDSON and other coconspirators created false settlement documentation, including HUD-1 Settlement Statements and other closing documents, purporting to authorize A-NU to receive at settlement the mortgage loan proceeds in excess of any pending lien on the property.

18.   It was further part of the conspiracy that defendant HUDSON, V.H., and other coconspirators conspired to purchase the following properties by means of the fraudulent scheme set forth above: 712 Kenyon Street, N.W., Washington, D.C.; 2013 13th Street, N.W., Washington, D.C.; 515 LeBaum Street, S.E., Washington, D.C.; and 1212 42nd Place, N.E., Washington, D.C. ("Hudson properties").  As a result of the conspiracy, defendant HUDSON, V.H., and other coconspirators fraudulently obtained more than $500,000 in proceeds from mortgage loans on the Hudson properties.

## OVERT ACTS

19.   Within the District of Columbia and elsewhere, in furtherance of the conspiracy and to accomplish the goals thereof, the following overt acts, among others, were committed and caused

to be committed by defendant HUDSON, V.H. and other coconspirators:

### 712 Kenyon Street, N.W., Washington, D.C.

(1) On or about April 28, 2004, defendant HUDSON contracted to buy the property located at 712 Kenyon Street, N.W. in Washington, D.C. (Kenyon Street property) from its homeowner, S.B.

(2) In or about May 2004, defendant HUDSON caused S.B. to signed a bogus settlement document purporting to authorize A-NU to receive approximately $138,000 in mortgage loan proceeds.

### 2013 13th Street, N.W., Washington, D.C.

(3) On or about April 27, 2005, defendant HUDSON caused V.H. to create and submit a false loan application to Fremont.

(4) In or about April 2005, defendant HUDSON cause a coconspirator to create a bogus settlement document purporting to authorize A-NU properties to receive $171,000 in mortgage loan proceeds.

### 515 LeBaum Street, S.E., Washington, D.C.

(5) In or about April 2005, defendant HUDSON caused J.D. to promise G.J., the property owner of 515 LeBaum Street, S.E. in Washington, D.C., that G.J. could "redeem" her interest in the property within a year.

(6) In or about April 2005, defendant HUDSON cause a coconspirator to create a bogus settlement document purporting to authorize A-NU properties to receive $60,189.71 in mortgage loan proceeds.

**1212 42nd Place, N.E., Washington, D.C.**

(7)     In or about March 2005, in the District of Columbia, defendant HUDSON caused a coconspirator to create a bogus HUD-1 settlement sheet bearing the forged signature of the property owner of 1212 42nd Place, N.E., Washington, D.C.

(8)     In or about March, 2005, defendant Hudson caused a coconspirator to create a bogus settlement document purporting to authorize A-NU properties to receive $82,132.27 in mortgage loan proceeds.

**(Conspiracy, in violation of Title 18, United States Code, Section 371)**

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA


By: _____
G. Bradley Weinsheimer
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C.  20530
(202) 514-6991
Bar No. 431796