UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. 06-209 (GK) |
| | : | |
| v. | : | VIOLATIONS: 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| ANTOINE P. HUDSON, ALSO KNOWN AS | : | |
| ANTIONE P. HUDSON | : | FILED |
| | : | |
| Defendant. | : | AUG 0 2 2006 |
| | : | NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the government, through its undersigned counsel, and defendant Antione P. Hudson, advised by his undersigned counsel, Danny Onorato, stipulate and agree that the following facts are true:

### STOLEN VEHICLES CONSPIRACY (COUNT ONE)

In or about July 2003, and thereafter, ANTOINE P. HUDSON, also known as ANTIONE P. HUDSON, ("HUDSON") ran a stolen car operation which involved the use of a stolen "VIN" on a stolen luxury vehicle to disguise the identity of the stolen luxury vehicle's true owner. HUDSON recruited associates to identify stolen cars available for sale. A.H. recruited other associates, including J.W., to identify a customer for the stolen cars available for sale. To purchase a stolen vehicle, HUDSON generally required a $5,000 deposit.

On or about August 6, 2003, J.W. drove R.L., to the Eastern Market in Washington, D.C., where J.W. and HUDSON spoke about R.L.'s interest in a stolen luxury vehicle. During the conversation between J.W. and HUDSON, R.L. remained alone in the car. HUDSON told J.W. that he had several vehicles in stock.

On or about April 19, 2004, J.W. gave HUDSON $10,000 as a down payment on a stolen Mercedes for R.L.

On or about April 26, 2004, HUDSON gave the Mercedes CLK500 to J.W. J.W. agreed to collect an additional $20,000 from R.L. before delivering the CLK500 to R.L. On or about April 27, 2004, HUDSON received approximately $20,000 from J.W.

HUDSON does not dispute that the government can establish beyond a reasonable doubt that: (1) on or about April 27, 2006, in Washington, D.C., J.W. received $20,000 from R.L. in exchange for the CLK500; (2) the CLK500 was a new luxury vehicle which was stolen on October 7, 2003, from the lot of HBL, LLC, a Mercedes dealership located in Vienna, Virginia; (3) law enforcement obtained possession of the CLK500 on or about April 27, 2004, and determined at that time that the CLK500 had a stolen VIN in its windshield; (4) the stolen VIN on the windshield of the CLK500 in fact corresponded to a 2003 Mercedes CLK500 registered in Evanston, Illinois; and (5) the CLK500 had a sales price of $58,655.

FALSE STATEMENTS TO FINANCIAL INSTITUTIONS CONSPIRACY (COUNT TWO)

In or about May, 2004, and thereafter, HUDSON owned a business named A NU Properties ("A-NU"), which purported to be a property management company. As its sole proprietor, HUDSON exercised primary decision making authority for A-NU's business and received the largest share of its profits. HUDSON recruited and employed an assistant and an acquaintance, J.D., to help conduct A-NU's business. Moreover, HUDSON recruited a mortgage loan officer, V.H., to obtain mortgages for A-NU's clients.

From May 2004 to June 2005, HUDSON, V.H., J.D. and other coconspirators conspired to purchase the following properties by means of the following fraudulent scheme set forth below: 712 Kenyon Street, N.W., Washington, D.C.; 2013 13th Street, N.W., Washington, D.C.; 515 LeBaum Street, S.E., Washington, D.C.; and 1212 42nd Place, N.E., Washington, D.C. ("Hudson properties").

ANTOINE P. HUDSON identified a financially distressed homeowner whose property had a true market value which far exceeded the amount of any pending mortgage lien. HUDSON arranged for himself or an acquaintance, including J.D., to buy the property from the homeowner without disclosing the sales price for each transaction. HUDSON, J.D. and others known and unknown expressly and/or impliedly promised to each homeowner in a false and fraudulent manner that A-NU would: (a) use the proceeds of any property transaction to extinguish the homeowner's debts; and (b) allow the homeowner to repurchase the property within a year of any transaction, when in truth, and in fact, defendant HUDSON: (a) intended to divert a substantial portion of the mortgage loan proceeds for his own personal gain and profit; and (b) fully knew that the distressed homeowner was unaware of the properties' true market value, and hence, would be unable to actually repurchase the property in the future.

HUDSON knew that the buyer for each property was applying for a mortgage loan far in excess of the distressed homeowners actual financial needs. At HUDSON's request, V.H. and other coconspirators caused the mortgage lenders, including Fremont Savings & Loan, to receive false mortgage loan applications and other documents material to the buyer's creditworthiness for the maximum mortgage loan commensurate with the properties' true market value. HUDSON knew that the loan applications for the Hudson properties contained false information to mislead the mortgage lenders to approve the loans in excess of the buyer's creditworthiness. For example,

HUDSON knew that several loan applications for the Hudson properties indicated that the mortgagee was intending to occupy the property, when, in truth, and in fact, HUDSON knew that the distressed home owner purporting to sell the property to the mortgagee was intending to remain in the property for at least the first 12 months ensuing after the transaction.

At HUDSON's request, V.H. and other coconspirators created false settlement documents, including HUD-1 Settlement Statements and other closing documents, purporting to authorize A-NU to receive at settlement the mortgage loan proceeds in excess of any pending lien on the property. HUDSON then deposited the mortgage loan proceeds into a single bank account held in the name of A-NU at BB&T bank, a financial institution whose deposits were insured by the FDIC. Thereafter, HUDSON spent a substantial portion of the mortgage loan proceeds deposited from the A-NU account for his own personal gain.

HUDSON does not dispute that the government can establish beyond a reasonable doubt that, as a result of the above-mentioned conspiracy, defendant HUDSON, V.H. and other coconspirators fraudulently obtained more than $500,000 in proceeds from mortgage loans on the Hudson properties; (2) the mortgage lenders on some of the Hudson properties included Fremont Savings

and Loan ("Fremont"); and (3) Fremont was a financial institution with deposits insured by the FDIC.

 

                Respectfully submitted,

                KENNETH L. WAINSTEIN
                UNITED STATES ATTORNEY
                FOR THE DISTRICT OF COLUMBIA

By:           _____
                G. Bradley Weinsheimer
                Assistant United States Attorney
                555 4th Street, N.W.,
                Washington, D.C. 20530
                (202) 514-6991
                Bar Number 431796

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Crim. P. 11, after consulting with my attorney, Danny Onorato, I agree and stipulate to this Statement of Offense.

Date: 8/2/06

_____
ANTIONE P. HUDSON
Defendant

I have discussed this Statement of Offense with my client ANTIONE P. HUDSON. I concur with his decision to stipulate to this Statement of Offense.

Date: 8/2/06

_____
Danny Onorato
Attorney for the Defendant