UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. CR-06-209 (GK) |
| | : | |
| ANTOINE HUDSON, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. For the reasons set forth below, the government respectfully recommends that the Court sentence defendant Hudson to a period of incarceration within the applicable guideline range.

**I.     FACTUAL BACKGROUND**

On August 2, 2006, defendant Hudson entered a pre-indictment guilty plea to a two-count Information charging conspiracy to traffic in stolen vehicles and stolen vehicle parts, in violation of Title 18 United States Code Sections 371, 2314, and 2321, and to make false statements to financial institutions, in violation of Title 18 United States Code Sections 371 and 1014.

**The Stolen Car Conspiracy**

From approximately July 2003 through at least April 2004, defendant Hudson ran a stolen car operation which involved trafficking in stolen vehicles and using stolen vehicle identification numbers "VINs" to disguise the identity of the stolen vehicle's true owner. Defendant Hudson recruited associates to identify stolen cars available for sale, located buyers

willing to purchase luxury stolen vehicles at a reduced price, and then negotiated the sales and delivery of the stolen vehicles.

On August 6, 2003, for example, a cooperating witness drove a prospective buyer to the Eastern Market in Washington, D.C., where the cooperating witness and defendant Hudson spoke about the customer's interest in a stolen luxury vehicle. During the conversation, defendant Hudson reported that he had several vehicles in stock. On April 19, 2004, the cooperating witness gave defendant Hudson $10,000 as a down payment on a stolen Mercedes that the customer had agreed to purchase. On April 26, 2004, defendant Hudson gave the stolen Mercedes CLK500 to the cooperating witness, who agreed to collect an additional $20,000 from the customer before final delivery of the vehicle. Investigation revealed that the Mercedes CLK500 was a new vehicle that was stolen on October 7, 2003, from the lot of HBL, LLC, a Mercedes dealership located in Vienna, Virginia. Law enforcement officers obtained possession of the stolen Mercedes CLK500 on April 27, 2004 and determined that the CLK500 had a stolen VIN in its windshield. The Mercedes CLK500 had a sales price of $58,655.

### The False Statements to Financial Institutions Conspiracy

Defendant Hudson's conspiracy to make false statements to financial institutions centered on obtaining mortgages for real estate through fraud. From May 2004 through at least June 2005, defendant Hudson owned a business named A NU Properties ("A-NU"), which purported to be a property management company. As its sole proprietor, defendant Hudson exercised primary decision making authority for A-NU's business and received the largest share of its profits. Defendant Hudson's scheme worked essentially as follows: defendant Hudson would identify a financially distressed homeowner whose property had a true market value which far

exceeded the amount of any pending mortgage lien.  Defendant Hudson then arranged for himself or an acquaintance to buy the property from the homeowner at the increased market price, which was financed through a mortgage.  The buyers were no more than "straw buyers" in that they had no real interest in the property and certainly had no intention to live there, despite claims to the contrary in mortgage documents.

Defendant Hudson and his co-conspirators promised each homeowner that A-NU would use the proceeds of any property transaction to extinguish the homeowner's debts (both the existing mortgage lien and any existing consumer debt) and allow the homeowner to repurchase the property within a year of any transaction.  All along; however, defendant Hudson knew that the homeowners for the most part did not fully understand the implications of the transaction and certainly did not understand that they would lack the financial ability to buy back the property at the increased mortgage amount.  Instead, defendant Hudson intended to divert a substantial portion of the mortgage loan proceeds for his own personal gain and profit.  In a recorded conversation to a cooperating witness during the course of the investigation, defendant Hudson explained his scheme:

> We take it {the money from settlement} out immediately at settlement and let them stay in that (expletive deleted) and at the end of the year, we tell 'em, if you want your house, we'll sell it back to you … if not, it's ours…. Either you lose your (expletive deleted)  to foreclosure or you take that.  Most people within that year … they … gonna … if they (expletive deleted)  they credit up, they gonna (expletive deleted)  that money up … that I give 'em…. And they ain't gonna be able to afford to get the house back….. The people not gonna' be able to buy the house back.  It's my (expletive deleted) house.  Then I renovate it and put that (expletive deleted) on the market for more.

Defendant Hudson knew that the buyer for each property was applying for a mortgage loan far in excess of the distressed homeowner's actual financial needs and ability to pay.  That

was the whole purpose of the scheme: were the homeowner able to re-finance on her own, there would be no need for the straw buyer. As charged in the Information in this case, the scheme involved the four properties that are listed in the chart below.[1] Closing costs, settlement, and other fees were paid from mortgage proceeds at the time of settlement. In each transaction, some amount of the new loan proceeds went to the homeowner/seller, but a significant portion went directly to defendant Hudson and A-Nu properties. The proceeds at issue for each of the four properties in this case were significant, as reflected in the table below:

| Property | Old Mortgage Amount | New Mortgage Amount | Proceeds from Sale to Seller and Hudson |
|---|---|---|---|
| XXX LeBaum Street, SE | $149,783 | $239,969 | $72,189 |
| XXX Kenyon Street, NW | $140,484 | $394,716 | $219,056 |
| XXXX 42nd Place, NE | $91,079 | $228,292 | $97,132 |
| XXXX 13th Street, NW | 632,984 | $848,915 | $171,318 |

With respect to XXX Kenyon Street, the sale was made directly to defendant Hudson. The sale to defendant Hudson closed on May 20, 2004 for a mortgage amount just over $309,000; yet just over one year later, on June 20, 2005, defendant Hudson again refinanced the property for more than $394,000, from which he took out of the deal more than $76,000. At no time did

---

[1] Mr. Hudson and A-Nu properties were involved in mortgages and property sales for additional properties other than those charged in the Information, and some of those properties may have been sold through fraud. Those properties were not the subject of this investigation and were not included in the Information. There is at least one other transaction that now is the subject of a civil suit between the original homeowner and Mr. Hudson, and a similar fraud scheme is alleged

4

defendant Hudson live at XXX Kenyon Street, nor did he intend to do so, despite his repeated claims to financial institutions to the contrary.  Samantha Burch Leach (the homeowner) always has lived at the residence since the time of the initial transaction, and she now is taking steps to have the property titled back to her.  Not surprisingly, as noted in the presentence report, the property now is the subject of foreclosure proceedings, and most recently is the subject of a civil suit filed by Ms. Burch Leach against defendant Hudson.

      To obtain mortgages in an amount commensurate with the properties' maximum market value, defendant Hudson and his co-conspirators caused the mortgage lenders, including Fremont Investment & Loan and American Residential Mortgages (a company no longer in business), to receive false mortgage loan applications and other documents material to the buyer's creditworthiness.  Defendant Hudson knew that the loan applications for the properties contained false information to mislead the mortgage lenders to approve the loans in excess of the buyer's (or the original homeowner's) creditworthiness.

      The transaction involving XXX Kenyon Street provides an example of the false statements made to financial institutions.  Samantha Burch Leach, formerly Samantha Burch, and her family have lived at XXX Kenyon Street, NW literally for decades – in fact to this day, Ms. Leach  resides there.  In 2005, Ms. Leach  recently had taken over the property from her grandfather, who, while still living at the residence, was elderly and in failing health.  Ms. Leach herself had credit problems, had amassed some consumer debt, and was having difficulty making mortgage payments.  Defendant Hudson preyed on these circumstances and arranged to have the property sold to him with a new mortgage of $309,000.  He later re-financed the property with a

---

in the civil suit.

new mortgage for more than $394,000.  Despite representing in loan application documents and other papers that defendant Hudson intended to live at XXX Kenyon Street, NW, defendant Hudson had no intention of living there.

Despite his representations to the homeowners that they would be able to buy back their properties after one year, none was able to do so; indeed, even today, no homeowner has been able to have her property titled back to her.  With respect to XXXX 13th Street, for example, the straw buyer now is involved in a bankruptcy proceeding in Maryland, and the original homeowner, Patricia Patton, is working with the buyer and the bank to have the property transferred back to Patricia Patton.  Ms. Patton has remained at XXXX 13th Street since the time of the sale.  The circumstances of XXX LeBaum Street are quite similar.  Not only was the homeowner unable to buy back her property, it recently was the subject of foreclosure proceedings and was sold at auction.  The homeowner now is considering legal action against defendant Hudson.  At the time of the initial transactions, the homeowners knew the sales price for the properties and knew that they were being sold to other people, but the homeowners had no idea what would be required to buy the properties back after one year.  Given the credit history of each at the time of the sale, it is highly unlikely that any mortgage lender would have given the homeowner a mortgage at the new sale price.  Despite representations to the mortgage lender by Hudson and his coconspirators, the buyers never have lived at the properties, nor did they ever intend to do so.

The pattern continues with XXXX 42nd Place.  The homeowner was having credit problems and was having difficulty making mortgage payments.  Relying on a straw buyer (the cousin of one of defendant Hudson's coconspirators) and misrepresentations, defendant Hudson

was able to obtain a mortgage for the property at a vastly increased market value. From the deal, the homeowner, Betty Ames, a D.C. government worker, received approximately $15,000; whereas defendant Hudson pocketed more than $82,000. Over time, defendant Hudson did pay off some of Ms. Ames's consumer debts, but she still was left with an increased mortgage payment that she currently pays to the "buyer" in the form of rent. Defendant Hudson, on the other hand, walked away from the transaction with a sizeable profit of more than $40,000. Ms. Ames has remained at the residence since the time of the transaction and is working to have the property titled once again to her.

### Post-Arrest Assistance and Acceptance of Responsibility

As part of the plea agreement in this case, defendant Hudson agreed to cooperate with law enforcement. Mr. Hudson met with law enforcement officers and discussed various topics. Pursuant to the plea agreement, the government has provided this information to the Departure Committee of the United States Attorney's Office. The government concludes that defendant Hudson has not provided substantial assistance in the investigation or prosecution of another person and declines to file a motion seeking a departure pursuant to U.S. Sentencing Guidelines Section 5k1.1. Defendant Hudson nonetheless has remained cooperative following entry of his guilty plea and did enter an early plea in this case prior to indictment. He has accepted responsibility for his conduct. As part of the plea agreement, the government agreed not to oppose a three-level adjustment for acceptance of responsibility, and the government believes defendant Hudson is entitled to this reduction.

## II.     SENTENCING STANDARDS

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court held that the Sixth Amendment, as construed in <u>Blakely v. Washington</u>, 532 U.S. 296 (2004), applies to the federal Sentencing Guidelines. Accordingly, the Supreme Court "imposed a global remedy for the Sixth Amendment difficulties with the Sentencing Guidelines, invalidating their mandatory application and instead requiring district courts to consult them in an advisory fashion." <u>United States v. Labastida-Segura</u>, 396 F.3d 1140, 1142 (10th Cir. 2005). Thus, the sentencing court must fashion a reasonable sentence guided by the factors specified in 18 U.S.C. Section 3553(a), including correct application of the sentencing guidelines. <u>United States v. Price</u>, 409 F.3d 436, 442-443 (D.C. Cir. 2005). Although the sentencing judge also must weigh the other factors enunciated in 18 U.S.C. § 3553(a), "it is important to bear in mind that <u>Booker/Fanfan</u> and section 3553(a) do more than render the Guidelines a body of casual advice to be consulted or overlooked at the whim of a sentencing judge." <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005). Indeed, the "failure to follow the strictures of the guidelines is among the errors that might cause a sentence to be overturned on appeal" as unreasonable. <u>Price</u>, 409 F.3d at 442-443 (D.C. Cir. 2005).

Courts have noted that "<u>Booker</u> requires judges to engage in a two-step analysis to determine a reasonable sentence." <u>United States v. Doe</u>, 412 F. Supp.2d. 87, 90 (D.D.C. 2006). This process has been described as follows:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

Id. (quoting United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005)). Following numerous other Circuits that have addressed the issue, the D.C. Circuit has concluded that "a sentence within a properly calculated guidelines range is entitled to a rebuttable presumption of reasonableness." United States v. Dorcely, 454 F.3d 366, 377 (D.C. Cir. 2006).[1] See United States v. Pickett __ F.3d __, 2007 WL 445937 (D.C. Cir Feb. 13, 2007) (noting that the appellate standard does not obviate the need for the sentencing judge to evaluate how well the applicable guideline effectuates the purposes of sentencing under Section 3553(a)).

As for the second step of the Booker sentencing analysis, the court in imposing sentence must as well consider the other factors of Section 3553(a):

> These factors include, among others, the nature of the offense, the defendant's history, the need for the sentence to promote adequate deterrence and to provide the defendant with needed educational or vocational training, any pertinent policy statements issued by the Sentencing Commission, the need to avoid unwarranted sentencing disparities among similarly situated defendants, and the need to provide restitution to any victims. *See* 18 U.S.C. § 3553(a) (2000) (amended 2003).

Price, 409 F.3d at 442 (D.C. Cir. 2005).

---

[1] See United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006); United States v. Williams, 436 F.3d 706, 708 (6th Cir. 2006); United States v. Green, 436 F.3d 449, 457 (4th Cir. 2006); United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005); United States v. Lincoln, 413 F.2d 716, 717 (8th Cir.), cert. denied, 126 S. Ct. 840 (2005). See also United States v. Cooper, 437 F.3d 324, 330-31 (3rd Cir. 2006) ("While we review for reasonableness whether a sentence lies within or outside the applicable guidelines range . . . it is less likely that a within-guidelines sentence, as opposed to an outside guidelines sentence, will be unreasonable.").

### III.     SENTENCING CALCULATION AND RECOMMENDATION

#### Sentencing Guidelines calculation

The government has no objection to the guideline calculation presented in the presentence report.  This calculation, an offense level of 19 and criminal history category of I, results in a zone D range of imprisonment of 30 to 37 months.  This calculation also is consistent with the calculation agreed to by the parties in the plea agreement.

#### Sentencing Recommendation

##### A.     Sentencing Factors Justify the Recommended Sentence

Based upon a guideline offense level of 19 and an applicable imprisonment range of 30-37 months, the government recommends a sentence within the guideline range.  Applying all of the factors of 18 U.S.C., §3553(a), we believe this would be both an appropriate and reasonable sentence.

Taking into consideration the nature and seriousness of the offenses and mindful of the need to fashion a sentence which promotes deterrence and a just punishment, the government believes that a sentence within the applicable guideline range is appropriate.  With respect to trafficking in stolen vehicles, Mr. Hudson's enterprise had a potentially harmful impact to hard working members of this community.  Car theft is a significant issue in many neighborhoods because of the importance many individuals place on the ability to get around as easily as possible.  We use our cars to go to work, to take children to school, to purchase basic necessities, and for many other purposes.  As a result, having a car stolen goes beyond a mere inconvenience; it disrupts the routine activities that many people engage in on a daily basis.

While it is not alleged that Mr. Hudson stole cars himself, he certainly created an enormous economic incentive for those who were involved in stealing cars. Mr. Hudson created a market by assuring those who would steal cars that he had a willing set of buyers, and Mr. Hudson's enterprise certainly amassed the profit to make stealing cars a worthwhile venture. Creating a market and incentive for stolen cars certainly exacerbates what already is a significant crime problem in this community. As a result, Mr. Hudson's criminal activity is serious and potentially affected hard working people as they attempted to undertake their daily business. The requested sentence therefore is reasonable not only as it provides appropriate punishment, but because it will serve as a valuable deterrent to others who want to take the easy way out by resorting to criminal activity.

With respect to the false statements to financial institutions charge, the type of fraud scheme in which defendant Hudson engaged is damaging not only to financial institutions, which made loans based on false and intentionally misleading information, but to the homeowners who essentially were duped into signing away their most significant and cherished asset: their home. The devastating impact of this scheme can be seen in two clear ways, first from the perspective of financial institutions, and second from the perspective of the homeowner.

Financial institutions must rely on representations made to them when making decisions about when to extend loan offers. While they could undertake extensive background investigations anytime anyone submitted a loan application, this would substantially increase the fees and time associated with obtaining loans. In this case, the very basis of the loan application was nothing more than a sham. The "buyers" and loan applicants had no intention of taking possession or control of the mortgaged property and they were involved in the transaction

precisely because they could qualify for a loan, whereas, the owners of the property at the time could not. Indeed, Mr. Hudson's fraudulent scheme was premised on false statements concerning who would be possessing, and in a real sense owning, the property in order to obtain loans. Once obtained, Mr. Hudson not only enriched himself financially but put himself in a position to retain the property for good.

It may be true that there is more financial institutions could do to verify the information provided to them and they perhaps should exercise greater care in extending certain loans. The current mortgage loan crisis is fueled in part by lax standards and lack of accountability for the loans that are issued. That a situation may be ripe for abuse; however, does not give anyone the license to make false statements in furtherance of a fraud scheme. Mr. Hudson was not forthright with lending institutions when he or coconspirators applied for loans, and even had they conducted a background investigation, they would have little way of knowing that Mr. Hudson simple was lying when he and coconspirators represented that they intended to live in the mortgaged property as a residence. This false representation goes to the very heart of the basis for the loan, and no lender would lend money to a straw buyer who was brought into the deal because the homeowner lacked the credit worthiness to refinance the property.

With respect to homeowners, the impact of Mr. Hudson's criminal scheme has been devastating. Mr. Hudson had promised that he would clean up each homeowner's credit problems and that homeowners would have an opportunity to buy back their property at the end of one year. He knew full well, however, that their ability to buy back the properties at the inflated mortgage amounts was dubious at best. Indeed, it appears from his own statements that defendant Hudson was confident of the homeowners' inability to buy back their homes as a

12

further way he could enrich himself in the scheme. While it is true that Mr. Hudson did take steps to pay off the debts of the homeowners using proceeds from the loans, this action does not begin to justify his criminal conduct. Even with debts paid, the homeowners lacked the financial ability and credit worthiness to buy back their properties at the end of one year. The result of Mr. Hudson's misrepresentations to financial institutions has been fairly predictable: the true owners of the properties have not been able yet to have the properties returned to them and the properties face the prospect of foreclosure.

Those who engage in the type of fraud scheme in which defendant Hudson participated must realize that punishment in the form of incarceration will be meted out once their fraud scheme is uncovered. This is not a case where just one property was involved nor where the amounts that were subject of the fraud scheme were small. Defendant Hudson's very business enterprise was predicated on fraudulently obtaining properties and mortgages to finance the properties. A sentence within the applicable guideline would send a strong message that those who engage in this sort of fraud scheme should think twice, given the prospect of imprisonment.

It is important to note that Mr. Hudson is not someone who lacks education, opportunities, or a supportive family. As the presentence report notes, defendant Hudson was not subjected to abuse as he grew up, and both parents, while living apart, were able to provide for him, and he still enjoys a close relationship with his parents. Mr. Hudson has attended college at the University of Maryland and also completed coursework from Prince George's Community College, from which he became a certified real estate appraiser. Mr. Hudson has no history of alcohol or substance abuse. He thus had the tools and background to make good decisions had he chosen to do so. Instead, he chose a different path. Those who chose a criminal

path, and especially those who have a variety of other paths from which to choose, must understand that actions have consequences. In this case, that should mean a significant period of incarceration. Such a sentence not only would provide just punishment, but it would provide a strong deterrent for anyone who finds themselves at a similar crossroads.

While it is true that defendant Hudson has some legitimate job history, has strong family ties, and has accepted responsibility, these factors do not suggest that he should be given a break and an opportunity at further leniency beyond that afforded in a sentence within the applicable guideline. It may be that these factors, coupled with his education and vocational training, suggest defendant Hudson is less of a risk for recidivism than other defendants. The nature and seriousness of the offense nonetheless demand a significant period of incarceration in this case. In making its recommendation, the government is mindful that defendant Hudson has entered an early plea and has accepted responsibility for his conduct. Because of these circumstances, the government agrees that it is appropriate for defendant Hudson to receive the three level reduction in offense level for acceptance of responsibility. This reduction already has been calculated in the final offense level of 19. This reduction more than adequately adjusts defendant Hudson's sentence for his assistance and overall acceptance of responsibility.

An important factor of 18 U.S.C. §3553(a) that the court must consider in fashioning an appropriate sentence is treating similarly situated offends similarly. From this perspective, the guidelines range, while advisory, provides reasonable assurance that defendant Hudson will be treated fairly when compared to similar offenders. The goal of the Sentencing Guidelines is to "move the sentencing system in the direction of increased uniformity… [so that] offenders who engage in similar real conduct would receive similar sentences." U.S. v. Booker, 543 U.S. at

254-255 (2005).  The Supreme Court in <u>Booker</u> further noted that the Guidelines are an important tool Congress intended for the courts to use in achieving uniformity in sentencing.  Defendant Hudson simply is unable to point to any exceptional circumstance that warrant a sentence below the "heartland" the Sentencing Guidelines are intended to capture.  <u>See</u> USSG Ch 1, Pt A, comment 4(b) (defining the "heartland" as "a set of typical cases embodying the conduct that each guideline describes," and noting that "[w]hen a court finds an atypical case… the court may consider whether a departure is warranted").

      With respect to restitution, the presentence report notes that restitution is not an issue in this case for a variety of reasons.  First, and perhaps most significantly, defendant Hudson already has forfeited more than $307,000 in a separate but related civil proceeding.  Indeed, as part of the plea agreement, defendant Hudson agreed not to contest the administrative forfeiture of these funds, and the parties understood these funds would be used for restitution. With respect to Count One, since the vehicle was recovered, restitution is not an issue.  With respect to Count Two, the victims of false statements made to financial institutions are Fremont Investment and Loan and American Residential Mortgage (a company that since the commission of the offense has closed and no longer exists).  Principally because the market value of the properties at issue in this case is at or near the loan amounts, there is no restitution owed to these victims.  To the extent they were directly harmed by the defendant's conduct during the course of the conspiracy, the homeowners/sellers of each property would be entitled to restitution.  In this case, however, the principle loss suffered by each homeowner is the loss of title to her property (that is, each sold the property in the hope of having the property returned to her after one year), and the homeowners are taking steps to have the properties returned to them.   To the extent any

15

homeowner has an additional claim for restitution, she may file a claim as to the funds already forfeited by defendant Hudson.

### B.      Defendant Hudson is Not Entitled to a Sentence Outside the Guidelines

To the extent defendant Hudson seeks a probationary sentence or one below the applicable guideline range, such a sentence would be inappropriate in this case. Under the Sentencing Guidelines, the defendant's sentencing range falls in Zone D of the Sentencing Table, which requires that "the minimum term. . . be satisfied by a sentence of imprisonment." USSG Ch. 5, Pt. C1.1(f). The official commentary to this section states that when the sentencing guideline range is in Zone D, imprisonment substitutes (such as probation or community service) are not appropriate. See USSG Ch. 5, Pt. C1.1(f), comment. 8.

Defendant Hudson may claim that his scheme, while fraudulent, was designed in an effort to help distressed homeowners recover from financial debt. Such an argument ignores the financial gains defendant Hudson sought through his scheme, overlooks the predictable consequences of his scheme, and largely is irrelevant to the charged offense. Defendant Hudson is charged with engaging in a conspiracy to make false statements to financial institutions. Whatever may have been his intent with respect to the homeowners, it is clear that Mr. Hudson made false statements to financial institutions as part of a fraudulent scheme to get them to make loans they otherwise would not have made. The sentence recommended through the sentencing guidelines appropriately and reasonably punishes this conduct.

Of course in weighing the factors of 18 U.S.C. §3553(a), the court must consider what weight to give the Sentencing Guidelines. In doing so, the Court should consider whether or not defendant Hudson's arguments and basis for imposing a sentence outside the applicable

guideline already is contemplated within the structure of the Sentencing Guidelines. Accordingly, the fact that the defendant accepted responsibility for his crime by entering a plea of guilty and the fact that the defendant does not have a criminal record should not be considered as a basis for a sentence beneath the guideline range. These factors already are considered by the Sentencing Guidelines in determining the defendant's sentencing range. Computation of the defendant's sentencing range reflects his early plea of guilty, pursuant to USSG Ch. 3, Pt. E1.1, and his lack of criminal history, pursuant to USSG Ch. 4, Pt. A1.1. See U.S. v. Dyce, 91 F.3d 1462, 1469 (D.C. Cir. 1996) (noting that "Criminal History Category I is set for a first offender . . . [t]herefore, a departure below the lower limit of the guideline range for Criminal History Category I on the basis of the adequacy of criminal history cannot be appropriate," and recognizing that a defendant's "remorse/full explanation" is likewise considered in computing the guideline range, so "a further reduction is prohibited for an acceptance of responsibility").

      Similarly, despite that defendant Hudson may claim he has important responsibilities to his family and to his children in particular, the Sentencing Guidelines state that family ties and responsibilities "are not ordinarily relevant in determining whether a departure may be warranted." USSG §5H1.6 (policy statement). Factors such as family circumstances are relevant in departure determinations only in "exceptional cases." USSG Ch. 5, Pt. H, intro. comment. As a result, family ties and responsibilities are characterized as "discouraged" departure factors. Koon v. U.S., 518 U.S 81, 95 (1996); see also U.S. v. Tucker, 386 F.3d 273, 277 (D.C. Cir. 2004) (recognizing that "family responsibilities" are a "rare, but permitted," ground for departure).

In sum, the Sentencing Guidelines help to assure that similarly situated offenders are treated similarly, and defendant Hudson is unable to point to any exceptional circumstances that would persuade the Court that a sentence outside the Guidelines is appropriate and reasonable in this case. To the contrary, a sentence within the applicable guideline range would be a reasonable sentence in that it takes into account defendant Hudson's acceptance of responsibility but also would provide just punishment and deterrence and appropriately takes into consideration the nature and seriousness of the offense.

IV.    **CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the defendant to a term of incarceration within the applicable guideline range.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

/S/
_____
G. BRADLEY WEINSHEIMER
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-6991
Bar Number 431796