IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) Crim. No. 1:06-CR-00209 (GK) |
| ANTOINE HUDSON | ) |
| Defendant | ) |

## MEMORANDUM IN AID OF SENTENCING

Antione P. Hudson, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing. Mr. Hudson respectfully requests that the Court, after considering his background and the totality of the record, including the advisory sentencing guideline range, sentence him to a sentence period of 24 months incarceration. As grounds for this request, Mr. Hudson states as follows:

### I.   Introduction

Antoine Hudson stands before the Court having entered a plea of guilty to a count of conspiring to traffic in stolen vehicles and stolen vehicle parts, in violation of 18 U.S.C. §§371, 2314, and 2321, and conspiring to make false statements to financial institutions, in violation of 18 U.S.C. §§371, 1014. Antoine Hudson is extremely remorseful for his conduct in this case. Indeed, he has agonized greatly over his actions. We respectfully submit, and as we detail below, Mr. Hudson has undertaken only what can be described as extraordinary efforts to remedy his wrongful conduct in this case.

During the past two years, Mr. Hudson has been through the most difficult period in his life. He has had to come to grips with his criminal conduct and the ramifications of his conduct, which has caused him health problems. Mr. Hudson, who is only 35 years old, was diagnosed with hypertension at the age of 31. He has been attempting to treat hypertension and high blood pressure, which have been significant during this time period. He is on medication to help his symptoms, but the stress of this case has taken a great toll on Mr. Hudson.

The stress and thought of incarceration has also fueled a problem that Mr. Hudson has had with alcohol abuse. On many nights during the past two years, Mr. Hudson used alcohol as a means to escape the reality of his legal troubles. He and his family members and friends have recognized that he has a problem with alcohol consumption. Mr. Hudson realizes that he is not helping his other health condition by drinking excessively. As a result, we would ask the Court to order that the Bureau of Prisons monitor and treat Mr. Hudson's hypertension and to recommend that Mr. Hudson be evaluated for alcohol treatment while incarcerated.

Mr. Hudson has suffered great despair as a result of his actions. He is now the subject of numerous lawsuits in the Superior Court. He has hurt his children financially and been absent as a positive role model. His actions have strained the relationship he had with his father. Based on the foregoing, we respectfully submit that a sentence of 24 months is appropriate when balancing the factors under 18 U.S.C. 3553.

### A.    Offense Conduct

Mr. Hudson acknowledges that all of his actions in this case were wrong. Although he did not steal any automobiles directly, Mr. Hudson realizes that his actions did help create a market for stolen vehicles. He makes no excuse for participating in a market for selling stolen

cars and receiving commissions as a result of those sales. Mr. Hudson is embarrassed and sorry for his conduct.

With respect to his work at A Nu Properties, Mr. Hudson again agrees that his actions were wrong in that he facilitated fraudulent mortgage applications as part of these transactions. Many people that Mr. Hudson conducted business with were in financial distress. They could not get refinancing or loans on the properties and many of the homes were in foreclosure proceedings. Of course, if the home went into foreclosure, the homeowner would lose the property and any equity that may have accumulated during their period of ownership.

Though improper, Mr. Hudson's actions in this case were designed to give the homeowners an opportunity to get some of their equity of the home, which would not have occurred if the home was foreclosed on, provide a cushion so that Mr. Hudson could make payments on the home, and give the distressed homeowner an opportunity to rebuild their finances. There is no dispute that Mr. Hudson viewed this as a money-making opportunity. As it turned out, the plan was doomed from the start. Many of the individuals that Mr. Hudson conducted transactions with simply did not make payments, like Samantha Burch Leach, or were overextended on their other finances.

## II.    Personal Background of Mr. Hudson

Antoine Hudson was born in Washington, D.C. in 1972. He is the only child born to the union of his mother and father, although Mr. Hudson has three other half-siblings that he shares close relations with. Growing up, Mr. Hudson spent time living between his parents' homes.

He graduated from St. John's High School in 1990 and enrolled in the University of Maryland thereafter. His education was interrupted in 1991 after Mr. Hudson was shot during

the course of a robbery. Although he continued to go to college, Mr. Hudson eventually dropped out in 1994.

Mr. Hudson got married at an early age and divorced after a four-year marriage. He has a son who is now 14-years-old, with whom he is very close. Mr. Hudson has a very good relationship with his former wife. He provides financial support for his son and is a constant presence in his life.

Mr. Hudson has two other children that he is very close with. He provides financial support to both of them. He has a three-year-old son that lives in Los Angeles. In addition, he has a one-year old daughter living in Warldorf, Maryland. Mr. Hudson is a constant presence in the lives of his children and realizes he needs to set a better example for them.

### III.     Adverse Consequences Suffered as a Result of His Conduct

The accusations in this case were originally lodged approximately two years ago. Mr. Hudson has had a difficult time dealing with the stress associated with the ramifications of his actions. First, the prospect of going to federal prison has caused Mr. Hudson great anxiety. He has had difficulty coping with this fact. His health has been affected. He was diagnosed with hypertension shortly after he turned 30 and it has worsened more recently. These circumstances have made if very difficult on him, although he blames no one but himself for his troubles.

In addition, Mr. Hudson has been the subject of much civil litigation as a result of this case. With the prospect of prison and the uncertainty of the outcome of this case, Mr. Hudson has had a difficult time supporting himself financially. He has relied upon family and friends to help him in this difficult time in his life. After sentencing, Mr. Hudson will be branded a

convicted felon. His prospect for career advancement is bleak given his limited educational background.

Mr. Hudson understands that he is solely responsible for his conduct in this case. He realizes that, in addition to the pain he has caused himself, his mother and children have also suffered greatly. Mr. Hudson has had to explain to his eldest son that he made bad choices that will result most likely in a period of incarceration. It was difficult for him to explain the situation to his son, who is 14-years-old. He has vowed to make sure that he continues to be a good father to his son, but feels helpless when he considers that he will miss a good portion of his son's teenage years as a result of his conduct. In addition, Mr. Hudson has also been devastated in that his conduct has damaged his relationship with his own father.

### IV. Cooperation efforts with the Government

We would like to note that Mr. Hudson has been extremely willing to assist the government in the prosecution of others in an effort to earn a downward departure in this case. He met with federal agents and prosecutors on numerous occasions. Although he did not earn a departure motion, he did provide critical information to the government in a proceeding before another judge of this Court. Counsel would like to provide more information about Mr. Hudson's efforts at the bench.

### V. Special Circumstances Warranting Consideration for Extraordinary Acceptance of Responsibility

Ordinarily, this Court has discretion to depart from the Sentencing Guidelines if the Court finds "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the guidelines. *See* 18 U.S.C. 3553(b); U.S.S.G. 5K2.0. Before a departure is permitted, the court must find that aspects of the case are "unusual enough

for it to fall outside the heartland of cases in the Guidelines." *See Koon v. United States*, 518 U.S. 81, 98 (1996).

Courts have held that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual.'" *United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996). Restitution may constitute a basis for downward departure where "it shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present." *United States v. Hendrickson,* 22 F.3d 170, 176 (7th Cir. 1994). *See United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999); *United States v. Bennett,* 60 F.3d 902, 905 (1st Cir. 1995); *United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir. 1994). *See also United States v. Blakburn*, 105 F.Supp. 2d 1067 (D.S.D. 2000) (court granted downward departure to insure that restitution was made and placed defendant on a longer period of supervision in a failure to pay child support case where guidelines called for 12-18 month prison term); *United States v. Miller*, 991 F.2d 552 (9th Cir. 1993) (voluntary restitution exhibiting extraordinary acceptance of responsibility can justify downward departure); *United States v. Davis*, 797 F. Supp 762 (D.C.N. Ind. 1992) (8-level departure granted where defendant made voluntary restitution of $750,000). *See also United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) (departure for extreme remorse "permissible factor" for departure if it is present to some exceptional degree); *United States v. Jaroszenko*, 92 F.3d 486 (7th Cir. 1996).

Allowing a sentencing court to depart from the Guideline range on the basis of extraordinary acceptance of responsibility adheres with the Sentencing Commission's express

acknowledgment that "it is difficult to prescribe a single set of guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch. l,pt. A, 4(b).  The Eleventh Circuit recently reaffirmed this policy, asserting that "[i]nstead of concrete legal rules" courts look to a range of factors including voluntariness, efforts to make restitution, percentage of funds restored, timing of restitution, and demonstration of sincere remorse and responsibility. *United States v. Kim,* 364 F.3d 1235, 1244 (11th Cir. 2004).  *See also Oligmueller,* 198 F.3d at 672; *Hairston,* 96 F.3d at 108-09; *United States v. DeMonte,* 25 F.3d 343, 347 (6th Cir. 1994); *Lieberman,* 971 F.2d at 996.

### A. Mr. Hudson's Efforts in This Case Were Extraordinary.

Whether a factor is present to a degree not adequately considered by the Guidelines is "... determined in large part by comparison with the facts of other Guidelines cases." *Koon, supra,* 518 U.S. at 98.  An examination of the cases where a defendant's restitution was found to be extraordinary and a downward departure was justified reinforce the conclusion that a departure is warranted in Mr. Hudson's case, although his efforts are different than restitution.

In *United States v. Kim,* 364 F.3d 1235 (11th Cir. 2004), the defendants were charged with scheming to defraud approximately $268,237.00 from WIC, a program directed toward providing supplemental food and nutritional assistance to women, infants, and children. *Kim*, 364 F.3d at 1238.  Following indictment, plea agreements were negotiated. *Id.*  On their plea date, the defendants tendered $50,000.00 of personal funds as partial satisfaction of restitution. *Id.*  At sentencing, defendants presented a check for the remaining restitution amount and moved for downward departure under § 5K2.0, on the basis of extraordinary restitution. *Id.*  Similar to the case-at-bar, the Kim defendants obtained this money in a short amount of time. *Id.*  The Kim

7

defendants relied upon securing loans from family and friends, and the court affirmed the ruling of the sentencing court, holding that defendants' "payment of restitution was extraordinary enough to remove it from the heartland of cases because it demonstrated sincere remorse and acceptance of responsibility." *Id*. at 1244.

In *United States v. Bennett,* 9 F.Supp.2d 513, 516, 517 (E.D.Pa. 1998), *affirmed*, 161 F.3d 171, 178-79 (3rd Cir. 1998), the defendant, president of a charitable organization, defrauded various donors of approximately $350 million by falsely promising investors that they would double their contributions in a few months.  In actuality, the defendant repaid initial investors with funds received from subsequent investors. *Id.* at 517.  The defendant entered a conditional plea to 82 counts, including bank fraud, mail fraud, wire fraud, false statements, filing false tax returns, and money laundering. *Id.* at 516.  Prior to sentencing, the Bankruptcy Trustee had accomplished restitution of approximately $334 million, largely through the agreement of investors who had doubled their money, to return the funds they had received. *Id.* at 519.  The sentencing court held that:

> While the defendant did not demonstrate an acceptance of personal responsibility as contemplated by U.S.S.G. § 3E1.1, his close cooperation and his early turn over of the bulk of his personal and company held assets materially assisted the process of reducing the loss and occurred to an unusual degree. In these circumstances, the post-offense restitution was atypical and merited a downward departure under U.S.S.G. § 5K2.0.

*Id.* at 526 (citing *Lieberman*, supra, 971 F.2d at 995).

In *United States v. Oligmueller, supra*, 198 F.3d at 670, the defendant misrepresented the number of cattle he owned in order to obtain a loan from a bank.  When the defendant's fraud was discovered, he owed the bank approximately $894,000. *Id.*  Prior to his indictment, the defendant began to liquidate his assets, pledge other assets to the bank, which he had not

previously pledged, took a second job, and set up a business in order to pay restitution to the bank. *Id.* Through these efforts, the defendant was able to pay the bank approximately $808,000 in restitution. *Id.* On the basis of the defendant's efforts, the Eighth Circuit Court of Appeals affirmed the sentencing court's grant of a downward departure pursuant to Section 5K2.0. *Id.* at 672.

In *United States v. Crossey,* 1992 WL 80540 (N.D.Ill. 1992), the defendant, a bank employee, embezzled money from her employer over several years. The defendant "... ultimately informed her employer of her theft, arranged to make substantial restitution, made restitution in the amount of $145,000, and cooperated with the government, the bank, and the bank's insurance companies, in the investigation of her offense." *Id.* The district court found that the defendant's conduct constituted a reasonable basis for a downward departure. *Id.*

      **B.**    **Mr. Hudson's Extreme Remorse and Payment of Restitution Was Extraordinary, as such, a Departure of Two Levels is Warranted**

We submit the circumstances and consequences in the instant matter are atypical in that they take the case out of the applicable guideline's heartland. As such, a departure is warranted on the grounds of Mr. Hudson's extreme remorse and efforts at restitution.

Mr. Hudson took responsibility for his conduct, as soon as he could in this case. Even before negotiating his own plea agreement, he acknowledged his wrongdoing and wanted to take responsibility for his conduct. As the government points out in its memorandum, there are a number of properties, approximately 12, involved in Mr. Hudson's business that were not the subject of the instant case. Nevertheless, Mr. Hudson coordinated efforts with the prosecutors to insure that the mortgages for those properties were paid, even though the assets of his company, as well as his individual assets, were frozen by law enforcement. Mr. Hudson was able to help

supplement payments for many of the homeowners.[a]  As a result, he took steps to insure that the banks and individuals would be made whole and to substantially minimize any damage that his actions may have caused.

Mr. Hudson's efforts were extraordinary in that he spent countless hours working with counsel, investigators, and homeowners to make better the situation that he helped create.

As the defendant in *Crossey*, Mr. Hudson shortly cooperated fully with investigators regarding his fraud and made arrangements to assist in collection of money to supply to lenders. Consistent with *Oligmueller, Crossey*, and *Kim*, Mr. Hudson's efforts were extraordinary and "shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present." *Hendrickson,* 22 F.3d 170, 176 (7th Cir. 1994).  Thus, we respectfully request that the Court grant Mr. Hudson an additional two level downward departure pursuant to Section 5K2.0, placing his offense level at 17.

---

[a] While not really an issue for the Court to consider in this case, we feel it is necessary to take issue with the way the government characterized Mr. Hudson's dealings with Samantha Burch Leach.  Samantha Burch Leach never lived at the premises on Kenyon Street.  Her grandfather did until he passed away.  After her grandfather passed away, the home remained, in the main, unfurnished.  A cousin of Ms. Burch Leach's would enter the home occasionally.  It is important to note that a civil dispute has arisen between Ms. Burch and Mr. Hudson.  We would like to note for the record that Ms. Burch Leach, despite agreeing to do so, never made a single payment to Mr. Hudson, A Nu Properties, or to any mortgage company.  Her main concern was to allow her grandfather to remain in his home, which occurred.  In a verified civil complaint that Ms. Leach filed in the Superior Court, Ms. Burch Leach acknowledged that "under the terms of the purported agreement Ms. Leach thought A Nu Properties would: a) use the equity from her home to pay off her debts; b) permit her, through A Nu Properties, to refinance the mortgage; and c) assuming that she made all of her payments on time for twelve months, have A Nu Properties lien on the property extinguished.  Verified Compliant at page 3, paragraph 10.  The government has never disputed that Mr. Hudson made payments of more than $25,000 to creditors of Ms. Burch Leach and that Ms. Burch Leach has never made a single mortgage payment on a property that she owned that was about to go into foreclosure.  As a result, Mr. Hudson has paid more than $50,000 in mortgage and tax payments on the property, despite Ms. Burch Leach's acknowledgment that she was required to make payments.

### VI. Sentencing Factors

We would respectfully ask the Court, after consideration of the factors set forth in 18 U.S.C. § 3553(a), to sentence Mr. Hudson to a two-year sentence of incarceration.

### A. The Nature and Circumstances of the Offense and History and Characteristics of the Defendant

We recognize that the facts and circumstances surrounding this crime are serious. Mr. Hudson has paid, and will continue to pay, a high price for his conduct. He will be incarcerated, he will lose civil liberties, and he will have difficulty finding employment upon his release from prison. Mr. Hudson is the subject of numerous civil lawsuits as a result of his conduct.

It is important to note, however, that Mr. Hudson did make extraordinary efforts to mitigate any damage that may have been caused by his actions. As the Court is aware, Mr. Hudson has no criminal history points.

We respectfully submit that the only way that the Court can truly get a proper assessment of Mr. Hudson's characteristics and history is through people that know Mr. Hudson. As such, we have attached Exhibits A-R. Here are some excerpts that illustrate Mr. Hudson's true character:

- Dr. Michael Lindsay of the Keys of Life Foundation, a non-profit organization committed to promoting and enhancing the optimal development of youth, speaks highly of Mr. Hudson's character and dedication. "The success of programs like ours is only possible through dedicated leadership and volunteerism. Mr. Hudson has selflessly given of his time and energy to contribute to the success of our organization, and has established himself as an invaluable member of our team… I can personally attest to Antoine's sincere efforts to make a difference in the world in which we live. He has been a true gem in KTLF's efforts to impact the lives of underserved youth."

- Ralph Simmons, owner of Exit Powerhouse Realty, speaks of Mr. Hudson's vision and hardworking nature, as well as his willingness to help others: "Unlike most other young men I come into contact with daily, Antione is always trying to find out how

we can learn something or how he can put people together to make their situations better. Whenever he is in the office, there always seems to be someone waiting in the lobby to meet with him for advice or present an idea. He does whatever he can and never likes to receive any praise for what he does….Antoine is my shoulder to lean on and has stuck with me through all the ops and downs that a new business faces. We are on the verge of creating a sophisticated Black owned business that contributes to the community."

- Bryan Revel, who has known Mr. Hudson since 1986, believes that he is an individual with the potential to make a positive impact on the upcoming generation. Mr. Revel believes that Mr. Hudson would be able to be a good influence on the youth of today, especially those that lack male role models, and help prevent them from leading a life of crime by talking about his own experiences. Mr. Revel also states that the benefit that Mr. Hudson gives his children would be immeasurable, and that his absence would be irreparable.

- Mr. Hudson's ex wife and the mother of his 14-year-old son, Vonda Hudson-James, also speaks to the quality of Mr. Hudson's parenting and ability to be a good role model. "I could not have asked for a better son in Antoine Jr. and I know most of who he is becoming as a young man is a direct result of the relationship he has with his father. It is emotionally unbearable for me to begin to conceptualize Antione Hudson Sr. not being able to continue to nurture the relationship with out son….He takes his role as a father very seriously; I can say in all honesty that Antoine Hudson Sr. is an exceptional man."

- Mr. Terrence Wynn, who went to high school with Mr. Hudson, testifies to the overwhelming kindness and care he has received from Mr. Hudson throughout the years. When Mr. Wynn had to deal with the loss of his mother and grandfather within a two-month span, Mr. Hudson helped not only with the burials, but with spiritual and moral support for the family.

- Mr. Clayton Paschal can speak to Mr. Hudson's ability to motivate others not only in the workplace, but in their person lives as well. "Motivator is the word I would use to describe Antione Hudson. Whether it is business related or personal, he is one of the main people I turn to when I need advice or that extra little push to get through a situation…Antoine's motivating spirit has given me an unexpected benefit in my personal life. That same spirit reminds me to do a little extra for my wife and focus on motivating my kids in their schoolwork and sports activities."

- Mr. David Lindsey has known Mr. Hudson for the past six years, and credits him with mentoring and aiding him in his efforts to establish his music career. Mr. Hudson encouraged Mr. Lindsey to write and produce his own music to present to top-level music executives, and as a result, is now being heard around the world. Mr. Lindsey also acknowledges Mr. Hudson as a role model. "He taught me as a mentor and

friend that when people made wrong choices, don't judge them, but rather help them in love that they may be able to change and come out of their situation….I hope that Antoine can be around to continue to lead us in the right direction."

- Mr. Noble Contee has been helped greatly by Mr. Hudson's mentoring.  While Mr. Contee is going through financial and emotional troubles, Mr. Hudson gives his assistance.  Mr. Contee relies on Mr. Hudson for his guidance in business as well as personal decisions. "Antoine is my help….I genuinely believe that there will be a void in my life and many others without him around."

- Cliff Jones, the CEO of Soul World Entertainment, states that Mr. Hudson is a man of good character. In January 2006, he recalls Mr. Hudson's efforts to help with The Keys of Life Foundation in providing time and monetary support for the less fortunate in the Washington Metropolitan Area.  He can also speak to Mr. Hudson being hardworking, truthful, and able to admit his mistakes.

- Starlyn Bradford, a struggling single mother, greatly appreciates all the support that Mr. Hudson is able to provide her.  She values his presence in her family's life immensely.

- The mother of his second child, Ms. Shanie Freeman, relies on Mr. Hudson for the physical, emotional, and financial support that he provides.  Mr. Hudson is an active influence in his son's life, speaking to him daily and spending time with him frequently.  Mr. Hudson's absence would be very painful for his four-year-old son to bear.

- Mr. Hudson's brother and sister have also written letters, describing their relationship and reliance on their big brother.  His brother credits his ability to stay out of trouble and be a good family member to the fact that he talks to Mr. Hudson on a regular basis.  Mr. Hudson's sister is especially fond of her brother, who took over the father role when her parents separated.  She states, "the security of knowing I have my big brother in my time of need is irreplaceable.  I can't imagine what the family will be like if he is not around."

- Mr. Hudson's niece has also written a letter, describing how her uncle spends time with her and encourages her to do well in school.

- Ms. LaShan Martin attests to the fact that Mr. Hudson literally saved her life.  While she was going through a difficult divorce and experiencing depression, she took an overdose of prescription drugs.  Mr. Hudson came to her aide and took her to the hospital and stayed with her until she recovered.

- Ms. Latisha Boyd describes Mr. Hudson's work with the community as well as his excellent relationship with his family.  She states that Mr. Hudson is a very good

13

person and that his family and friends as well as the community would suffer from his absence.

### VII. Analysis of §§ 3553(a)(2)(A) – 3553(a)(2)(D) Factors

We respectfully submit that a two-year sentence of incarceration in this case is consistent with the factors set forth in the statute. First, a criminal conviction for Mr. Hudson, as noted above, has had, and will continue to have, severe ramifications for Mr. Hudson.

A two-year sentence will adequately reflect the seriousness of the offense and provide more than adequate punishment for Mr. Hudson's offense. Indeed, a sentence of two years would merely reflect a two level decrease in Mr. Hudson's base offense level for his efforts to assist law enforcement and his extraordinary acceptance of responsibility.

Furthermore, Mr. Hudson's conviction and punishment to date have provided more than adequate deterrence generally to the community and specifically to Mr. Hudson. Mr. Hudson's arrest in this matter is no secret. Currently, there has been a very large crackdown on mortgage fraud cases. Indeed, there have been a number of highly publicized newspaper articles about one of the lenders in the case, Freemont, being shut down by regulators. Such conduct will not be tolerated. Thus, a message of deterrence has been sent. In addition, Mr. Hudson will not be a recidivist and regrets his actions in this case.

We respectfully submit that the remaining factors have no real applicability to this case with the exception of §3553(a)(6), Mr. Hudson's advisory guideline sentence range would be only 30-37 months at a level 19. A sentence of 24 months, the low end of the guideline range, assuming a two level departure, would be just based on the need to avoid sentencing disparities in similar cases.

We respectfully submit that when the Court considers the conduct at issue, Mr. Hudson's acceptance of responsibility, and his lack of criminal history points, that a sentence of 24 months is just and appropriate.

### VIII. Conclusion

Based on the foregoing and given Mr. Hudson's acceptance of responsibility and attempt to cooperate with the government in this matter, we respectfully request that the Court sentence him to a period of two years of incarceration coupled with alcohol assessment and treatment if necessary.

Date:  June 5, 2007

Respectfully Submitted,

SCHERTLER & ONORATO, L.L.P.

/s/
_____
Danny C. Onorato (#460043)
Schertler & Onorato, LLP
601 Pennsylvania Avenue, NW
North Building, 9th Floor
Washington, D.C.  20004
Telephone:  202-628-4199
Facsimile:  202-628-4177